**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **GLENNA PHILLIPS,** | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:05-CV-362-Y** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| **DEFENDANT.** | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.    STATEMENT OF THE CASE

Plaintiff Glenna Phillips brings this action pursuant to Section 405(g) of the Social Security

Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner

of Social Security denying her claim for disability insurance benefits under Title II of the Social

Security Act. Her claim has an extensive procedural history. She applied for both disability

insurance benefits and supplemental security income on January 18, 1995, alleging that a workplace

accident rendered her disabled beginning May 1, 1989. (Tr. 50, 121). The Social Security

Administration denied her applications for benefits both initially and on reconsideration.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 1**

Phillips requested a hearing before an administrative law judge (the "ALJ"), and ALJ Tela L. Gatewood held a hearing on June 10, 1997, in Lubbock, Texas.  (Tr. 570-607).  Phillips attended the hearing and was assisted by a representative.  ALJ Gatewood issued a partially favorable decision on March 13, 1998, finding that Phillips was disabled as of November 1, 1994, but not before that date.  (Tr. 17-41).  The Appeals Council denied Phillips' request for review of the decision, and she filed a claim for judicial review of the Commissioner's decision in the district court.  On October 16, 2000, the district court granted the Commissioner's motion for remand, reversed the administrative decision, and remanded the case to the Commissioner for further proceedings.  *Phillips v. Apfel*, NO. 5:00-CV-0169-C (N.D. Tex. Oct. 16, 2000).

ALJ R. Neil Lewis held a hearing in October 2001, and on November 30, 2001, issued a partially favorable decision finding Phillips disabled beginning in January 1995,  (Tr. 767-75); however, the Appeals Council granted Phillips' request for review and remanded the case for a supplemental hearing and consultation with a board certified neurologist.  (Tr. 779).  ALJ Lewis held a supplemental hearing on December 17, 2002, and on January 24, 2003, issued a partially favorable decision that Phillips had been disabled since November 1, 1994, but not before that date. (Tr. 814–22).  The Appeals Council subsequently issued an order adopting November 1, 1994 as the latest established onset date, which qualified Phillips to receive all SSI payments for which she was eligible, but remanded the case to assess Phillips' disability through September 30, 1992, when she was last insured for purposes of Title II disability insurance benefits.  (Tr. 112, 846).  *See Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1080 n.1 (5th Cir. 1981).  The Appeals Council also directed that a different ALJ be assigned to the case.

**<u>Findings, Conclusions and Recommendation of</u>**
**<u>the United States Magistrate Judge</u>–Page 2**

ALJ Randolph D. Mason held a hearing on Phillips' claim on July 26, 2004, at which Phillips appeared with counsel. (Tr. 903A-41). On September 22, 2004, ALJ Mason issued an unfavorable decision, finding that Phillips retained the ability to perform a limited range of sedentary work during the relevant period of May 1989 through September 1992. Accordingly, she was not considered disabled or entitled to disability insurance benefits at any time through the date she was last insured for benefits. (Tr. 622-37). Phillips filed exceptions to the ALJ's decision, (Tr. 614-17), but the Appeals Council declined to assume jurisdiction of the case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 610). *See generally* 20 C.F.R. § 404.984.

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 3**

*Id.* § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any  work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198.  If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995);  *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*.  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  The court will not re-weigh the evidence, try the questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000);  *Hollis*, 837 F.2d at 1383.

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 4

C.      ISSUES

    1.      Whether the ALJ erred in failing to find Phillips' impairments met or equaled the
            severity of a listed impairment;

    2.      Whether the ALJ gave adequate weight and consideration to the medical opinions
            in the record; and

    3.      Whether substantial evidence supports the assessment of Phillips' residual functional
            capacity and the ALJ's unfavorable determination at Step Five of the sequential
            evaluation process.

D.      ADMINISTRATIVE RECORD

    1.      Medical History[1]

        Phillips sustained a head injury during a fall at work in May 1989.  She began complaining

of severe headaches four months after her fall that progressed to atypical seizure-like episodes with

muscle spasms and twitching.  (Tr. 171, 624).  Diagnostic studies were generally negative, although

electromyography (EMG) and nerve conduction studies showed a C5-C6 nerve root compression

with some evidence of reinnervation.[2]  (Tr. 158). Phillips' treating neurologist, William Gordon,

M.D., diagnosed cervical syndrome and post-concussion symptoms.  (Tr. 354-59).

        Gordon's treatment records reflect that Phillips complained of cervical pain and headaches

in September and November 1989.  (Tr. 357-59).  Phillips reported doing pretty well in February

1990, but complained of occasional neck problems and visual problems.  She had demonstrated

---

    [1] Because the only issue is Phillips' entitlement to disability insurance benefits, review is limited to the
record as it relates to Phillips' mental and physical impairments as they existed on or before the date that her insured
status expired in September 1992. *See Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985); *Oldham v. Schweiker*,
660 F.2d 1078, 1080 n.1 (5th Cir. 1981).

    [2] Reinnervation refers to restoration of nerve function to a part from which it was lost, and may occur
spontaneously or by nerve grafting. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1555 (29th ed. 2000).

20/20 vision during an ophthalmology visit in December 1989.  (Tr. 160, 355).  Phillips complained

of spasms with excessive activity and persistent vision problems in April 1990.  (Tr. 353).  In May

1990, she  reported having two spells of restless leg symptoms and blurred vision.  (Tr. 351).

During an office visit in July 1990, Phillips reported that housework caused severe restlessness in

her legs.  A physical evaluation revealed chorea in her arms and legs.[3]  (Tr. 350).  Her diagnoses

included cervical syndrome, post concussion syndrome, restless legs, and left thoracic outlet

syndrome.[4]  (Tr. 344-46).  Phillips also went to the emergency room on several occasions in 1990

for neck and back pain, as well as restless legs, but was found to be neurologically intact on

assessment.  (Tr. 283-86).   Injections administered in the emergency room reportedly provided her

with some relief.  (Tr. 346).

On May 7, 1991, Phillips was treated and released from the emergency room for right

shoulder pain after she fell, although it was unknown if she had lost consciousness.  (Tr. 286).  On

May 10, 1991, Phillips reported having a seizure that caused her to fall and cut her hand on a piece

of glass.   (Tr. 278).  On examination, Philips demonstrated restless jerking in her legs, flailing of

her arms, and a tendency to stiffen her upper body and flex her arms.  An EEG revealed rare spike

waves in the right temporal region, but a computed tomography (CT) scan was normal.  (Tr. 278-

79).

Another seizure-like episode occurred while Phillips was driving her car in June 1991.  She

---

[3] Chorea is the ceaseless occurrence of a wide variety of rapid, highly complex, jerky, dyskinetic
movements that appear to be well coordinated but are performed involuntarily.  *Id*. at 345.

[4] Thoracic outlet syndrome refers to a variety of neurovascular syndromes resulting from compression of
the subclavian artery, the brachial plexus nerve trunks,, or less often the axillary vein or subclavian vein.  *Id*. at 1769.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 6

drove off the road and hit a pole.  (Tr. 161-74).  She was hospitalized for one week with a concussion, but no other significant injuries. (Tr. 161).  On examination, Phillips exhibited tension in her legs and some twitching, distortion, and grimacing in her face, but demonstrated normal reflexes, sensation, strength and coordination between episodes.  (Tr. 161, 172).  Magnetic resonance imaging (an MRI) was negative.  An EEG revealed mild encephalopathic changes that were possibly due to her medication.  Laboratory findings were positive for hypocalcemia,[5] and her medications were adjusted because her valproic acid[6] level was low.  (Tr. 163, 174).  Gordon opined that some of Phillips' earlier seizures were secondary to her medications, but he indicated that her current episodes of spasm and twitching had no established cause.

Phillips reported headaches and at least three additional spells in the following months.  (Tr. 339-43).  Her physical examinations remained unchanged, but she was forgetful and had oral dyskinesia.[7]  She also complained that her medication made her groggy.  (Tr. 343).  Gordon reported that Phillips was doing well when he saw her in early August 1991, but she reported having another seizure on August 23, 1991.  (Tr. 336-39).  In October 1991, Phillips reported a severe spell two weeks earlier.  She complained that her medications were not working and were upsetting her stomach.  (Tr. 335).  Gordon prepared a letter in January 1992 in which he stated that Phillips' cerebral concussion with post-traumatic seizure-like episodes, post-traumatic headaches, and

---

[5] Hypocalcemia is a reduction of the blood calcium levels below normal, and is manifested by hyperactive deep tendon reflexes, muscle and abdominal cramping, and spasms of the hand and feet.  *Id*. at 291, 861.

[6] Valproic acid is a medication used in the treatment of epileptic seizures.  *Id*. at 1929.

[7] Dyskinesia is the distortion or impairment of voluntary movement, such as tics or spasms, and may be due to long-term use of certain medications.  *Id*. at 554.

cervical strain with thoracic outlet syndrome were a direct result of her May 1989 accident and should be covered by her workers' compensation carrier.  (Tr. 331).

In April 1992, Phillips went to the emergency room with complaints of daily seizures for two to three weeks, with muscle twitching, neck pain, and disrupted sleep.  No seizure-like activity was observed, and her neurological examination was negative.  (Tr. 277).  Phillips saw Gordon on May 21, 1992.  She reported good days and bad days, with numbness in her left upper extremity and hand when she elevated her arm above shoulder-level, occasional facial numbness, and headaches.  (Tr. 330).  Neurological evaluation was again negative, but an EEG showed spike-wave forms similar to those found previously.  (Tr. 281, 329). During an office visit on June 23, 1992, Philips reported doing much better and denied having any additional spells.  She did complain of back pain with activity and pain and swelling in her knees and legs.  A neurological evaluation was again negative. No changes were made to her treatment regimen.  (Tr. 326).

Phillips stopped taking her medications in 1992 after learning that she was pregnant.  In August 1992, she went to the emergency room for a seizure that began the prior evening.  She had not taken her medication in a month.  She was able to move all her extremities and answer questions. No seizure activity was observed.  (Tr. 276).  Phillips was hospitalized in September 1992 for evaluation of increasing back and leg pain, jerking and twitching episodes, severe headaches, and spasms.  (Tr. 179).  Mild hypocalcemia was noted.  Philips resumed taking her medication, and was referred to an obstetrician.  (Tr. 180).

Phillips went to the emergency room again in October 1992 after experiencing a mild seizure.   (Tr. 275).  She was having no seizure activity when examined, and the neurological

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 8**

examination was within normal limits.  She also returned to the emergency room in November 1992 with complaints of neck and shoulder pain similar to other episodes she had experienced when her medication levels were too low.  (Tr. 274).  When she saw Gordon on December 9, 1992, she reported headaches, but no seizures, although her legs had felt restless a few days earlier.  Her neurological examination was unremarkable, and she was scheduled for a follow-up appointment in one month.  (Tr. 324).

Treating neurologist Gordon testified at the initial administrative hearing before ALJ Gatewood that he had treated Phillips since 1989.  (Tr. 574).  He testified that Phillips began experiencing muscle spasms in 1989 that had progressed over the next two years to actual seizure-like episodes that included some episodes with lapses in consciousness.  Gordon also testified that the car accident in 1991 may have augmented Phillips' difficulties and that she subsequently experienced a progressive deterioration in functioning that was likely a combination of psychological and physical factors.  (Tr. 574).  Gordon noted that some of Phillips' episodes resembled the neurological side-effects that anti-psychotic medications can cause. (Tr. 574, 629). Gordon opined that Phillips, despite medication, had been unable to function well since 1991 and was not able to function sufficiently to seek employment.  Although Phillips' condition waxed and waned, and she was able to complete her pregnancy reasonably intact, Gordon opined that Phillips had been unable function satisfactorily since about two years into her illness.  (Tr. 575).

Gordon remained Phillips' treating neurologist until 1998, when Phillips sought treatment from neurologist Bhupesh Dihenia, M.D.  (Tr. 565).  Dihenia diagnosed Phillips' condition as

dystonia muscular deformans,[8] and opined that Phillips' symptoms had begun four to five months after her 1989 head injury. Dihenia noted that the disease is progressive and incurable, and opined that persons with the disease were permanently disabled. (Tr. 565).

2.      Administrative Hearing

Phillips testified that she was born September 16, 1959. (Tr. 905). She dropped out of high school and never obtained a GED. Phillips testified that she has not worked since 1989, but previously worked as a keypunch operator and a maid. (Tr. 906).

Phillips testified that she was unable to work because any stress caused muscle spasms and dystonia, she was unable to drive, and she suffered from short-term memory loss. She testified that she had sought medical treatment continuously from 1989-1991 and was given medication that controlled, but did not stop, her symptoms. (Tr. 909). Her driver's license was revoked after a seizure caused her to wreck her car in 1991. Phillips testified that she was bedridden while pregnant with her youngest child in 1992. She had performed little housework during that time frame and depended on her husband or mother to assist her with grocery shopping and transportation.

Phillips testified that her seizures began in September 1989 and were precipitated by strenuous activity. (Tr. 918). She described her episodes as a restless feeling and jerky movements that sometimes responded to medication, but sometimes required her to seek emergency room treatment. (Tr. 914). Phillips testified that she had no difficulty sitting, but standing was difficult if she was having a seizure. Although her medications controlled her seizures now, that was not the

---

[8] Dystonia musculorum deformans is a rare chronic and genetic disease marked by involuntary, irregular, clonic contortions of the muscles of the trunk and extremities. *Id.* at 559.

case before 1998.  Strenuous activity could cause a seizure despite her use of medication.  (Tr. 917).

Phillips testified that, during the relevant time period, she had spent seventy-five percent of the time lying down.  (Tr. 922).  Her mother and son had assisted her with housework, laundry, and shopping.  Although Phillips had previously enjoyed horseback riding, water skiing, snow skiing, and ceramics, she stopped participating in any hobbies after she was injured.  (Tr. 923).  Phillips' husband also testified about his wife's seizures, and stated that her condition had essentially destroyed their family life.  (Tr. 933).

Medical expert Ann Turbeville also testified at this hearing.  Turbeville noted that Phillips had initially been diagnosed with cervical strain after a work-related fall in 1989, but Phillips subsequently reported problems with her arms, visual problems, memory problems, and shaking spells.  (Tr. 934-35).  Phillips had also developed psychiatric difficulties.  Turbeville noted a downhill course in Phillip's condition since the car accident in 1991, and concurred with Gordon's opinion that Phillips had been unable to function since June 1991.  (Tr. 935-36).

Turbeville testified that Phillips' primary diagnosis was a neurological one, but also testified that she thought Phillips had a somatoform disorder even though no such disorder had been diagnosed by treating sources.  (Tr. 937).  Turbeville assessed moderate difficulty in Phillips' ability to perform activities of daily living; moderate impairment in social functioning; marked impairment in concentration, persistence or pace; and multiple episodes of decompensation for durations briefer than two weeks.  (Tr. 937).  Turbeville opined that Phillips' condition was such that even minimal increases in mental demands or changes in her environment would cause her to decompensate.  (Tr. 937).

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 11

Vocational expert Todd Harden also testified.  He identified Phillips' work as a keypunch operator as sedentary, semiskilled work, while work as a housekeeper or maid was considered light, unskilled work.  Phillips also had work experience in route sales, which was medium, unskilled work.  (Tr. 938).  The ALJ asked Harden to consider an individual of Phillips' age, education and work history who was limited to sedentary work that consisted of simple, routine tasks with superficial interaction with the public and coworkers, and no work at unprotected heights or near dangerous machinery.  (Tr. 938).  Harden testified that work as a final assembler (with 20,000 jobs nationwide), lens inserter (with 12,000 jobs nationwide), and film touch-up inspector (with 19,000 jobs nationwide) would meet the criteria set by the ALJ.  (Tr. 939).

3.      Administrative Decision

The ALJ found that Phillips' severe impairments during the relevant time period consisted of her status post closed head injury, post-traumatic seizure-like episodes, left thoracic outlet syndrome, chronic cervical and lumbosacral strain, post-traumatic headaches, dystonia muscular deformans, personality changes, and depression.  (Tr. 624).  The ALJ, however, found no impairment or combination of impairments met or equaled the severity of any listed impairment. Instead, he found that Phillips retained the ability to obtain, perform, and maintain a limited range of sedentary work from May 1, 1989 through September 30, 1992.  (Tr. 635).  The ALJ restricted Phillips to sedentary work that consisted of simple, routine tasks, avoided unprotected heights or dangerous machinery, and required only superficial interaction with the public and coworkers.  (Tr. 635).

The ALJ determined that Phillips was unable to perform her past relevant work, but based

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge–Page 12**

on the vocational expert's testimony, the ALJ found that there was other work available in significant numbers that Phillips could perform. (Tr. 635-36). Accordingly, the ALJ found Phillips was not disabled or entitled to disability insurance benefits at any time from her alleged onset date through the date she was last insured for benefits. (Tr. 637).

E.     DISCUSSION

        1.      Listed Impairments

        Phillips contends that substantial evidence does not support determination the ALJ's decision that her physical and mental impairments do not meet or equal the severity of an impairment listed in Appendix 1 of the disability regulations. She contends that the medical opinions of the treating and testifying physicians establish that she met or equaled the listings for either a neurological impairment or somatoform disorder before her insured status expired.       As a threshold matter, opinions offered on some disability issues are not medical opinions, but are instead opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of the case. 20 C.F.R. § 404.1527(e). Opinions on whether an impairment meets or equals the requirements for a listed impairment are one example, although opinions that medical sources offer on this issue will be considered. *See id*. § 404.1527(e)(2). Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but it is still an issue ultimately reserved to the Commissioner. Social Security Ruling 96-5p. Whether the impairment is equivalent in severity to the requirements of a listed impairments requires a judgment that the medical findings equal a level of severity that prevents a person from doing any gainful

activity. *Id.* Because a finding of equivalence requires familiarity with the regulations and the legal

standard for severity, it is also an issued reserved to the Commissioner. *Id.* In addressing whether

Phillips' impairments met or equaled the severity of listed impairment, the ALJ concurred with the

opinions of the state agency medical consultants that Phillips had no such impairments. *See* 20

C.F.R. § 404.1526(b).

Phillips challenges the ALJ's determination at Step Three of the sequential evaluation

process, but she does not identify a listed neurological impairment(s) that her condition meets or

equals in severity according to the medical findings as shown in her medical record. Medical expert

Turbeville concurred with Gordon's opinion that Phillips had been unable to function since her car

accident in June 1991, although Turbeville was unable to pinpoint whether Phillips' problem was

neurological or psychological. Dihenia did not treat Phillips during the relevant period, but has

opined that dystonia muscular deformans is disabling and that Phillips' symptoms began within four

to five months after her head injury in 1989. The ALJ indicated that he considered the treating and

testifying physicians' opinions and assigned them some, but not controlling, weight. (Tr. 634).

The ALJ concluded that controlling weight could not be assigned to the disability opinions offered

by either Gordon or Turbeville because these opinions were not supported by the objective medical

record.[9] The ALJ also noted that Dihenia offered a generalized opinion that individuals with

dystonia muscular deformans were permanently disabled, but avoided stating that Phillips in

---

[9] Phillips acknowledges that Turbeville apparently provided somewhat different testimony when she
testified at Phillips' hearing in December 1992. The transcript from the earlier hearing is not included in the
administrative record, nor did the ALJ did not indicate that any change in Turbeville's testimony affected the weight
he was willing to assign to the medical expert's testimony. The ALJ's decision stands or falls for the reasons
identified in that decision. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 14

particular was disabled by her condition during the time period in question.  Phillips' contention that she is entitled to a presumptive finding of disability based on a neurological condition is not supported by the record.

Phillips does complain that the ALJ erred in denying the existence and disabling nature of a somatoform disorder, which was first identified by Turbeville.  Listing 12.07 outlines the criteria for a disabling somatoform disorder:

> **12.07 *Somatoform disorders***: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented by evidence of one of the following:
>
> 1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
>
> 2. Persistent nonorganic disturbance of one of the following:
>
> a. Vision, or
>
> b. Speech; or
>
> c. Hearing; or
>
> d. Use of a limb; or
>
> e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia[)]; or
>
> f. Sensation (e.g., diminished or heightened).
>
> 3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;
>
> AND
>
> B. Resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, app. 1, § 12.07.   The ALJ rejected Turbeville's testimony and found

that somatoform disorder was not a medically determinable impairment in Phillips' case, although

Phillips had exhibited symptoms of depression and reported personality changes.   The ALJ noted

that even Turbeville acknowledged that Phillips had never been diagnosed with somatoform

disorder.   In addition, the ALJ observed that accepting that diagnosis would not result in a finding

of disability because Turbeville's testimony did not establish medical findings that met the listing

for somatoform disorder.   (Tr. 634).   Regardless, the ALJ ultimately found that Phillips had both

physical and medically determinable mental impairments during the relevant time period, but not

a somatoform disorder.   Given that no treating source from the relevant time period has noted more

than a possible psychological overlay to Phillips' symptoms, the determination that Phillips did not

have and was not disabled by a somatoform disorder cannot be considered error or unsupported by

substantial evidence.

    Moreover, the ALJ did not deny that Phillips had mental impairments, though not a

somatoform disorder, and fulfilled his duty to assess Phillips' functional mental limitations caused

by her depression and unspecified personality changes.   *See generally* 20 C.F.R. § 404.1520a

(outlining technique used for evaluation of mental impairments).   The ALJ assessed mild restriction

in Phillips' activities of daily living, moderate restrictions in social functioning, moderate

deficiencies in concentration, persistence or pace, and no episodes of decompensation attributable

to her mental impairments during the relevant period.   (Tr. 634).   The ALJ's findings have the

support of substantial evidence as it relates to Phillips' condition before September 1992,[10] and the findings do not suggest that Phillips' mental impairments met or equaled the severity of a disabling mental impairment as identified in the listings. *See generally* 20 C.F.R. Part 404, Subpart P, app. 1, § 12.00(C).

Phillips has not demonstrated that the ALJ erred in his determination that she had no impairment or combination of impairments meeting or equaling the severity of an impairment included in the listing of impairments, nor has she shown that the ALJ's determination at Step Three of the sequential evaluation process is unsupported by substantial evidence.

2.      Residual Functional Capacity

Phillips contends that substantial evidence does not support the ALJ's assessment of her residual functional capacity on or before September 1992. She also complains of the ALJ's failure to explain how he determined her residual functional capacity. The ALJ found that Phillips was limited to sedentary work with seizure precautions, including the avoidance of unprotected heights and moving machinery, and limited to simple, routine tasks with only superficial interaction with the public and coworkers. (Tr. 635). The ALJ found that the record warranted no other restrictions.

RFC is what an individual can still do despite his limitations. 20 C.F.R. § 404.1545(a); SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and

---

[10] Although Phillips experienced a downturn in her mental condition that required hospitalization in 1994, that occurred well after the date her insured status expired.

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 17

continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SOCIAL SECURITY RULING 96-8p. RFC is not the least an individual can do, but the most. *Id.* The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. *Id*. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.*

Phillips contends that the medical source statements from her treating physicians and the testifying medical expert do not support the ALJ's assessment, but instead establish her disability. The ALJ summarized Gordon's reports and stated that he had carefully reviewed Gordon's progress notes from the relevant time period, as well as Gordon's testimony at the hearing in 1997. In summarizing the evidence, the ALJ noted that Phillips' examinations showed her to be intact neurologically, and during periods of exacerbation in her symptoms, Phillips' medication levels had generally tested below therapeutic levels or she had discontinued taking her medication. (Tr. 633). The ALJ found that Gordon's assertion that Phillips had not functioned satisfactorily since 1991 was unsupported by Gordon's own progress notes.

The ALJ also considered the disability opinions offered by Turbeville and Dihenia. The ALJ rejected Turbeville's testimony to the extent she concurred with Gordon's opinion for the same reasons he rejected Gordon's opinions, i.e,. the objective medical evidence for the period preceding September 2002 did not support a finding of disability. The ALJ in particular rejected Turbeville's testimony that Phillips could not handle even minimal increases in mental demands or changes in environment without decompensating because a review of the medical evidence did not support that

**Findings, Conclusions and Recommendation of**
**the United States Magistrate Judge**–Page 18

contention. As for Dihenia's later statements supporting disability, the ALJ noted that Dihenia framed his opinions as generalizations, whereas the objective evidence did not support a finding of disability with respect to Phillips for the time period under consideration.

The ALJ declined to assign controlling weight to the treating physicians' opinions or Turbeville's testimony, but he did given them some weight in finding Phillips was limited to sedentary work with seizure precautions and required simple, routine tasks and superficial interaction with the public and co-workers. Contrary to Phillips' contentions, the ALJ's decision reflects that he adequately weighed and  evaluated the available medical opinions in determining Phillips' residual functional capacity, and the ALJ provided a sufficient discussion of how he arrived at his conclusion. The ALJ's assessment of Phillips' residual functional capacity has the support of substantial evidence as that term is defined in the Fifth Circuit.

Phillips also contends that substantial evidence does not support the decision at Step Five of the sequential evaluation process that there is other work available for her in national economy. Her contention is premised on the argument that the ALJ erred in his assessment of her residual functional capacity, thus presenting the vocational expert with a flawed hypothetical question.  *See generally Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  As addressed *supra*, no error in the assessment of Phillips' residual functional capacity or a lack of supporting substantial evidence has been established.

The vocational expert was asked to consider an individual of Phillips' age, education, and work history with the residual functional capacity as found by the ALJ, and in response, the vocational expert identified at least three suitable occupations.  The ALJ's determination that there

were a significant number of jobs in existence that Phillips could have performed from May 1, 1989 through September 30, 1992 is supported by substantial evidence and has not been shown to be a product of legal error. Accordingly, the Commissioner's determination that Phillips was not disabled on or before the expiration of her insured status for purposes of benefits under Title II of the Social Security Act should be affirmed.

RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until June 22, 2006. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 22, 2006 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge–Page 21**

opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JUNE 1, 2006.


    /s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

**Findings, Conclusions and Recommendation of
the United States Magistrate Judge**–Page 22